## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DR. ABRAHAM SCHEER, M.D., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | |
| v. | : | |
| | : | |
| BEEBE HEALTHCARE; and | : | PLAINTIFF REQUESTS TRIAL BY JURY |
| BEEBE MEDICAL GROUP; and | : | |
| MARY FRANCIS SUTER (INDIVIDUALLY); and | : | |
| DR. ROBERT GULAB (INDIVIDUALLY); and | : | |
| DR. JEFFREY HAWTOF (INDIVIDUALLY); and | : | |
| LYNNE BOSKAMP (INDIVIDUALLY); and | : | |
| DR. DAVID A. TAM (INDIVIDUALLY); and | : | |
| RICK SCHAFFNER (INDIVIDUALLY) | : | |
| (*collectively* "Defendants") | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff, Dr. Abraham Scheer, by and through undersigned counsel hereby files this Civil Action Complaint against Defendants, Beebe Healthcare, Beebe Medical Group, Mary Francis Suter *(individually),* Dr. Jeffrey Hawtof *(individually),* Dr. Robert Gulab *(individually)*, Lynne Boskamp *(individually),* Dr. David A. Tam *(individually),* and Rick Schaffner *(individually)* (collectively "Defendants") and upon information and belief avers the following:

## **PARTIES**

1.      Plaintiff, Abraham Scheer ("Dr. Scheer" or "Plaintiff") is an adult individual who resides in the Commonwealth of Pennsylvania.

2.      Plaintiff, Dr. Scheer is a sixty-four-year-old male who is licensed to practice medicine in the State of Delaware and the Commonwealth of Pennsylvania.

3.      Defendant, Beebe Medical Group is a business organization which is licensed to and regularly transacts business in the State of Delaware with offices for the purposes of service at 424 Savannah Road, Lewes, DE 19958.

4.      Defendant, Beebe Healthcare is a business organization which is licensed to and regularly transacts business in the State of Delaware with offices for the purposes of service at 424 Savannah Rd, Lewes, DE 19958.

5.      Defendant, Mary Francis Suter is an adult individual who resides in the State of New Jersey with a business address for the purposes of service at 424 Savannah Rd, Lewes, DE 19958.

6.      At all times material to this civil action Defendant, Mary Francis Suter held supervisory authority over Plaintiff, Dr, Scheer.  Defendant, Mary Suter was employed by Defendants as the Administrative head of neurology and was empowered with the authority to take a tangible employment action against Plaintiff, Dr. Scheer during Plaintiff's employment for Defendants.

7.      Defendant, Dr. Robert Gulab (individually) is an adult individual who resides in the State of New Jersey with a business address for the purposes of service at 424 Savannah Rd, Lewes, DE 19958.

8.      At all times material to this civil action Defendant, Dr. Gulab held supervisory authority over Plaintiff, Dr, Abraham Scheer.   Defendant, Dr. Gulab was employed by Defendants as the Senior Vice President and Senior Medical Officer of Beebe Healthcare and Beebe Medical Group and had the authority to take a tangible employment action against Dr. Scheer during Plaintiff's employment for Defendants.

2

9.      Defendant, Dr. Jeffrey Hawtof (individually) is an adult individual who resides in the State of Delaware with a business address for the purposes of service at 424 Savannah Rd, Lewes, DE 19958.

10.     At all times material to this civil action Defendant, Dr. Jeffrey Hawtof held supervisory authority over Plaintiff, Dr, Abraham Scheer.  Defendant, Dr. Jeffrey Hawtof was employed by Defendants as the Chief Medical Officer of Beebe Healthcare and had the authority to take a tangible employment action against Dr. Scheer during Plaintiff's employment for Defendants.

11.     Defendant, Lynne Boskamp (individually) is an adult individual with a business address for the purposes of service at 424 Savannah Rd, Lewes, DE 19958.

12.     At all times material to this civil action Defendant, Lynne Boskamp held supervisory authority over Plaintiff, Dr, Abraham Scheer.  Defendant, Lynne Boskamp was employed by Defendants as the Interim Vice President of Patient Care of Beebe Healthcare and had the authority to take a tangible employment action against Dr. Scheer during Plaintiff's employment for Defendants.

13.     Defendant, Dr. David A. Tam (individually) is an adult individual with a business address for the purposes of service at 424 Savannah Rd, Lewes, DE 19958.

14.     At all times material to this civil action Defendant, Dr. David A. Tam held supervisory authority over Plaintiff, Dr, Abraham Scheer.  Defendant, Dr. David A. Tam was employed by Defendants as the President and Chief Executive Officer of Beebe Healthcare and had the authority to take a tangible employment action against Dr. Scheer during Plaintiff's employment for Defendants.

15.     Defendant, Rick Schaffner (individually) is an adult individual with a business address for the purposes of service at 424 Savannah Rd, Lewes, DE 19958.

16.     At all times material to this civil action Defendant, Rick Schaffner held supervisory authority over Plaintiff, Dr, Abraham Scheer.   Defendant, Rick Schaffner was employed by Defendants as the Executive Vice President and Chief Operating Officer of Beebe Healthcare and had the authority to take a tangible employment action against Dr. Scheer during Plaintiff's employment for Defendants.

17.     At all times material to this civil action, Dr. Scheer was qualified for the position of Director of Neurology and Stroke Services for Beebe Healthcare and Beebe Medical Group. Dr. Abraham Scheer also held the title of Neuro-hospitalist.   At all times material to this civil action Defendants were Plaintiff's joint and sole employers.

## NATURE OF THE CASE

18.     Plaintiff complains pursuant to Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq.* ("ADA"); the Family Medical Leave Act ("FMLA"); the Delaware Discrimination in Employment Act, 19 Del. C. § 710, *et. seq.* ("DDEA"); and under the laws of the State of Delaware and seeks damages to redress injuries Plaintiff suffered as a result of Defendants' discrimination, harassment, retaliation and the hostile work environment which was severe and pervasive and culminated in Plaintiff's unlawful termination from his employment for Defendants.

## JURISDICTION AND VENUE

19.     This action involves a Question of Federal Law under the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Family and

Medical Leave Act ("FMLA"), and the Delaware Discrimination in Employment Act ("DDEA"). The honorable Court has supplemental jurisdiction over Plaintiff's State Law Causes of Action.

20.     Venue is proper in the District of Delaware as Plaintiff was employed by Defendants and worked in Sussex County, Delaware where the discrimination, harassment and hostile work environment complained of occurred.

21.     On or around February 14, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants as set forth herein.

22.     Plaintiff's Charge of Discrimination was dual filed with the Delaware Division of Human Relations.

23.     On or about August 5, 2021, the EEOC issued to Plaintiff a Dismissal and Notice of Rights.

24.     This action is hereby commenced within ninety (90) days of receipt of the Dismissal and Notice of Rights.

## **MATERIAL FACTS**

25.     Plaintiff, Dr. Scheer began his employment for Defendants sometime around October 2010 and continued until his unlawful termination in September 2020.

26.     Plaintiff was hired as a Neuro-Hospitalist and is Board Certified in Pediatric Neurology, Adult Neurology, and Brain Injury Medicine.

27.     Plaintiff, Dr. Scheer worked at Beebe Healthcare treating patients and performing in-patient and out-patient neurology consultations.

28.     Soon after beginning him employment in October 2020, Plaintiff was promoted to Director of Neurology/Stroke Services as well as a neuro-hospitalist (to care for both inpatients and outpatients)

29.     At all times relevant to this civil action, Plaintiff, Abraham Scheer, M.D., was the Medical Director of Neurology / Stroke Services at Beebe's hospital in Lewes, Delaware.

30.     Sometime around August 2009, Plaintiff, Abraham Scheer, M.D., ("Dr. Scheer" or "Plaintiff") began his employment for Defendant, Beebe Healthcare and Defendant, Beebe Medical Group ("Beebe" or "Defendants") through a medical staffing agency named Staff Care.

31.     Dr. Scheer was assigned to work by Staff Care at Beebe located at 424 Savannah Road, Lewes, DE 19958.

32.     Dr. Scheer worked under the title Locum Tenens Neurologist.

33.     Sometime around October 2010, Dr. Scheer joined Beebe, as a Neuro-hospitalist and was contracted to treat both inpatients and outpatients at Beebe Hospital.

34.     Also sometime around October 2010, Dr. Scheer earned the title of Medical Director of Neurology/Stroke Services at Beebe.

35.     Dr. Scheer was employed by Beebe Medical Group as a Neuro-hospitalist and was contracted by the hospital to provide directorship in both neurology and stroke services.

36.     Dr. Scheer provided services to Beebe Healthcare as both an independent contractor for Beebe Healthcare and as a w2 employee for Beebe Medical Group.

37.     From October 2010 until Dr. Scheer's unlawful termination from his employment, Dr. Scheer managed uninterrupted, neurology services for Beebe Healthcare and Beebe Medical Group earning awards and accolades along the way.

38.     Under Dr. Scheer's leadership, Beebe Healthcare and Beebe Medical Group earned a stellar reputation and became an accredited Advance Primary Stroke Center providing services for the community.

39.     Under Dr. Scheer's leadership, Beebe's stroke program received the highest level of recognition, and earned the title Gold Star Plus stroke program by the American Heart Association/American Stroke Association.

40.     Every year from 2011 until 2020, under Dr. Scheer's leadership, Beebe earned Gold Star recognition for its stroke program from the American Heart Association/American Stroke Association.

41.     Dr. Scheer joined Beebe Healthcare in 2009 with the goal of leading the hospital in an effort to attain stroke center certification.

42.     In 2010, Beebe went on to attain certification from the Joint Commission as an Advanced Primary Stroke Center.

43.     That certification means that Beebe provides a nationally recognized standard of care that fosters the best possible outcomes for stroke sufferers.

44.     Beebe Healthcare continues to be certified as an advanced primary stroke center, because of the hard work and credibility that Dr. Scheer brought to Beebe Healthcare and Beebe Medical Group.

45.     Beebe earned The Joint Commission's Gold Seal of Approval and the American Heart Association/American Stroke Association's Heart-Check mark for Advanced Certification for Primary Stroke Centers under the leadership of Dr. Abraham Scheer.

46.     The Gold Seal of Approval and the Heart-Check mark represent symbols of quality from their respective organizations.

47.     Dr. Scheer, brought to Beebe over thirty (30) years of clinical experience after training at the finest institutions in the United States including Columbia University College of Physicians and Surgeons, University of Connecticut, University of Pittsburgh, George Washington University and Georgetown University, and Cornell Medical College.

7

48.     Dr. Scheer is currently a diplomat of the American Board of Psychiatry and Neurology.

49.     Dr. Scheer is also Board Certified in Adult Neurology with special qualifications in child neurology.

50.     Dr. Scheer is Board Certified by the American Board of Psychiatry and Neurology/American Board of Physical Medicine and Rehabilitation in Brain Injury Medicine.

51.     Dr. Scheer currently holds active and unrestricted medical licenses in five (5) states, including Delaware and Pennsylvania.

52.     Dr. Scheer was recognized by Beebe after receiving an independent award for Top Doctor (Neurologist) in the State of Delaware in 2019 – less than a year before Dr. Scheer's unlawful termination from employment.

53.     Beebe Healthcare claims to operate with a mission "to encourage healthy living, prevent illness, and restore optimal health with the people residing, working, or visiting the communities we serve."

54.     Plaintiff was contracted to work a minimum of 14 days out of every 30 or 31 days, however, for years without respite, Dr. Scheer worked significantly more days per month than the minimum under his contract.

55.     Dr. Scheer worked nine (9) months straight without a single day off.   During these nine (9) month periods, Dr. Scheer worked nights and weekends too.   Accordingly, Dr. Scheer worked 24 hours per day, for nine (9) months straight without respite.   Essentially, during these periods, Dr. Scheer only stopped working to sleep and eat.

56.     Dr. Scheer maintained this scheduled to serve the community to which Dr. Scheer felt a great deal of responsibility.   Dr. Scheer's objective was that no patient suffered due to a lack of neurology coverage. Dr. Scheer was successful in this endeavor and this was the driving force

for the accolades and recognition that Beebe Hospital and Beebe Medical Group received with respect to the neurology department.

57.    Dr. Scheer always made sure that there was continuous coverage for patients who required stroke services at Beebe Hospital.

58.    Dr. Scheer maintained a perfect attendance record from the day Dr. Scheer began his employment for Defendants and until May 2019, when Dr. Scheer was diagnosed with a disability under the Americans with Disabilities Act and requested reasonable accommodations and time off under the Family and Medical Leave Act.

59.    Dr. Scheer maintained perfect attendance in order to confirm that there was never an interruption of neurology coverage at Beebe Hospital.

60.    During the ten (10) year period that proceeded Dr. Scheer's unlawful termination, there was often times when other community neurologists called out at the last minute and Dr. Scheer covered for the other community neurologists to ensure no interruption in coverage.

61.    Even when other community neurologists called out at the last minute, Dr. Scheer always covered for them, above and beyond the requirements of Dr. Scheer's contract, in order to provide Beebe Hospital with a perfect record of uninterrupted stroke services for nearly a decade.

62.    Dr. Scheer provided perfect attendance and perfect stroke services at Beebe Hospital from 2010 to 2019.

63.    Sometime around May 2016, Dr. Scheer, and Beebe renegotiated Dr. Scheer's contract in order to account for the extreme and inhumane number of days every month that Dr. Scheer was required to work.

64.    Under the new contract Dr. Scheer was required to work 14 days per month with an additional six days per month if elected by Beebe, and if Beebe provided notice according to the specific contract conditions.

65.     Beebe never followed this contract.

66.     From 2010, the first time that there was no neurology coverage at Beebe Hospital was in May 2019.

67.     In May 2019, Dr. Abraham Scheer suffered from an attack caused by psoriatic arthritis, which is a disability under the Americans with Disabilities Act ("ADA") because it substantially limits one or more major life activities including but not limited to walking, sleeping, working, and exercising.

68.     The pain caused by the psoriatic arthritis limited Dr. Scheer's ability to work, and in May 2019, Dr. Scheer notified Defendants that he would be unable to cover a shift for another community neurologist.

69.     Dr. Scheer worked more than the 14 days minimum under the contract in May 2019.

70.     Dr. Scheer actually worked 20 days in May 2019, even though Defendants did not elect to request that Dr. Scheer work more than the 14 days required.

71.     The reason that Dr. Scheer worked 20 days in May 2019, which was over and above the contractual requirements, was because of Dr. Scheer's objective to provide constant, uninterrupted neurology coverage to serve the community.

72.     In May 2019, Defendants did not elect to ask Dr. Scheer to work any of the additional six (6) days provided under the contract.

73.     Defendants did not notify Dr. Scheer at any time after the schedule was posted that they wanted Dr. Scheer to work more than the 14 days under the contract.

74.     Still, Dr. Scheer put the medical community before his personal health and worked 20 out of 31 days in May 2019.

75.     Due to his psoriatic arthritis, which is a disability under the Americans with Disabilities Act, Dr. Scheer requested to take off from May 31, 2019, until June 4, 2019.

76.    This time off did not affect Dr. Scheer's contractual obligations, as Dr. Scheer still worked more than the minimum required 14 days in May 2019 and 14 days in June 2019.

77.    In June 2019, Dr. Scheer worked 24 out of the 30 days in June 2019.

78.    Dr. Scheer notified Defendants about his disability under the ADA in May 2019.

79.    When Dr. Scheer requested 5 days off due to his disability under the ADA in May 2019, Defendants reacted by subjecting Dr. Scheer to severe and pervasive discrimination and harassment in the workplace.

80.    From the time that Dr. Scheer put Defendants on notice about his disability under the ADA, Defendants began the process that would lead to Dr. Scheer's termination.

81.    Dr. Scheer was subjected to discrimination because of his disability.

82.    Dr. Scheer was subjected to retaliation because of the medial leave requests and medical leave.

83.    Defendants accused Dr. Scheer of abandoning his post.

84.    Defendants spoke to Dr. Scheer in a condescending and derogatory manner by suggesting that Dr. Scheer was not performing his job requirements, even though Dr. Scheer was fulfilling all contractual obligations.

85.    At all times, Dr. Scheer satisfied and fulfilled his obligations under the contract and then went far above and beyond those requirements for the good of the medical community and the community that Beebe Hospital is supposed to serve.

86.    Dr. Scheer's disability was the impetus that led to his unlawful termination from employment.

87.    Dr. Scheer continuously requested help from Defendants so that Beebe Hospital would have continuous neurology coverage for stroke services and so that Dr. Scheer would not

be subjected to inhumane conditions where Dr. Scheer had to work, far above and beyond the contractual requirements.

88.     Defendants never acted in accordance with the contract by notifying Dr. Scheer that they required him to work one of the six additional days to which Defendants could request under the contract.

89.     Dr. Scheer still worked those additional 6 days every month and more.   Dr. Scheer felt responsible for working this amount of time in order to maintain perfect neurology coverage.

90.     Dr. Scheer notified Defendants that the hours Dr. Scheer was required to work in order to maintain perfect coverage for stroke services was causing Dr. Scheer to suffer from and/or exacerbate his disability under the ADA.

91.     One of the primary triggers for psoriatic arthritis is physical and mental stress.

92.     By forcing Dr. Scheer to work 25 to 30 days every month, 24 hours per day, Dr. Scheer was caused to sustain and/or aggravate conditions related to his disability under the ADA.

93.     In July 2019, Defendant, Mary Francis Suter was hired by Defendants as the Executive Director of Cardiac and Vascular Services.

94.     In July 2019, Dr. Scheer held a meeting with Mary Francis Suter, where Defendant, Mary Francis Suter informed Dr. Scheer: "I am your boss.   You were never the Director of Neurology.   I am in charge of stroke services.   You work for me."

95.     Dr. Scheer suggested to Mary Francis Suter that before they continue the conversation, Defendant, Mary Francis Suter should review Dr. Scheer's contract, which expressly provided that Dr. Scheer was the Director of Neurology and Stroke Services for Beebe Healthcare.

96.     Mary Francis Suter left the room but did not return with Dr. Scheer's contract.

97.     Instead, Mary Francis Suter returned with Steve Rhome, who was the then Director of Nursing and In-Patient Services.

12

98.     Defendant Mary Francis Suter and Steve Rhome both informed Dr. Scheer that he was never the Director of Neurology and that Dr. Scheer was now reporting to Mary Francis Suter.

99.     Dr. Scheer suggested that they review his contract and then continue the discussion.

100.    Both Mary Francis Suter and Steve Rhome obtained Dr. Scheer's contract and conceded their error.

101.    Both Mary Francis Suter and Steve Rhome stated that Dr. Scheer was the Director of Neurology.

102.    At all times, Steve Rhome was aware that Dr. Scheer was the Director of Neurology.

103.    At all times, Mary Francis Suter was aware that Dr. Scheer was the Director of Neurology.

104.    The July 2019 meeting with Mary Francis Suter was further retaliation for Dr. Scheer requiring a day off due to his disability under the ADA.

105.    Defendants yelled at and disparaged Dr. Scheer due to the break in neurology coverage on May 31, 2019.

106.    Dr. Scheer continued to fulfill his obligations as Director of Neurology and Stroke Services and hired additional neuro-hospitalists to help eliminate the risk that could be caused by a lack of continuous neurology coverage.

107.    September 2019, Dr. Scheer worked 28 days, 24 hours per day.

108.    October 2019, Dr. Scheer worked 16 days, 24 hours per day.

109.    November 2019, Dr. Scheer worked 28 days, 24 hours per day.

110.    In December 2019, Dr. Scheer took his first time off since 2009, but still worked 11 days, 24 hours per day.

111.    January 2020, Dr. Scheer worked, 23 days, 24 hours per day.

112.    February 2020, Dr. Scheer worked 27 days, 24 hours per day.

113.    March 2020, Dr. Scheer worked 29 days, 24 hours per day.

114.    In April 2020, Beebe hospital was ravaged with patients suffering from the COVID-19 pandemic.

115.    Dr. Scheer continued to work in person at Beebe hospital from April 1, 2020, through April 7, 2020.

116.    Due to Dr. Scheer's disability under the ADA, he was at high risk for mortality due to the COVID-19 pandemic.

117.    Dr. Scheer's treating physician strongly recommended that Dr. Scheer discontinue in person work at Beebe Hospital due to the COVID-19 pandemic.

118.    At all times, Defendants refused to consider Dr. Scheer's medical condition, disability, or requests for time off as a reasonable accommodation under the ADA.

119.    Defendants replied to Dr. Scheer's requests by ordering Dr. Scheer to get the hell in here.

120.    As the conditions caused by the COVID-19 pandemic worsened, Dr. Scheer requested as a reasonable accommodation that he be permitted to work utilizing tele-medicine services.

121.    At this time, Dr. Scheer's medical condition, the psoriatic arthritis also worsened, and Dr. Scheer informed Defendants that he required telemedicine in order to continue performing the necessary functions of his employment.

122.    In April 2020, Defendants provided Dr. Scheer with equipment to perform telemedicine and also installed the equipment in the hospital so that Dr. Scheer could communicate with and diagnose patients who required neurology and stroke services.

123.    April 8, 2020, Dr. Scheer began utilizing telemedicine to treat patients who required stroke and neurology services.   With telemedicine, Dr. Scheer could provide comprehensive stroke and neurology services to patients without entering the hospital.

124.    In April 2020, Dr. Scheer could not physically work at Beebe hospital due to his disability under the ADA.

125.    Dr. Scheer notified Defendants about the disability and the limitations and accommodations that Dr. Scheer required.

126.    Dr. Scheer had trouble even walking and could not treat patients in person due to the physical limitations caused by his disability under the ADA.

127.    From April 8, 2020, until April 16, 2020, Dr. Scheer, utilized telemedicine to treat stroke and neurology patients at Beebe hospital from his home.

128.    The telemedicine program worked well, and Dr. Scheer was congratulated on a successful roll-out of the piolet program.

129.    Defendants notified Dr. Scheer that due to the success using telemedicine for stroke and neurology, Beebe would roll-out the program for other areas of medicine.

130.    April 16, 2020, Defendant, Dr. Jeffrey Hawtof sent Dr. Scheer an email and ordered Dr. Scheer to discontinue using telemedicine.

131.    There was no discussion or interactive process before Dr. Hawtof made the unilateral decision to withdraw the telemedicine program that Dr. Scheer relied on in order to provide neurology services to the community.

132.    There was no discussion or plan for how Dr. Scheer could continue without the reasonable accommodations.

133.    Defendant, Dr. Jeffrey Hawtof ordered Dr. Scheer to return to treating patients in the hospital by 7:00 P.M., on April 16, 2020.

134.    At no time did Defendants engage Dr. Scheer in an interactive process to discuss the discontinuation of the reasonable accommodations to which Dr. Scheer was afforded from April 8, 2020, until April 16, 2020.

135.    Moreover, Dr. Scheer had already worked more than 14 days in April 2020 and at no time did Defendants elect to request Dr. Scheer work any of the additional 6 days.

136.    Dr. Scheer notified Dr. Hawtof that Dr. Scheer had already fulfilled his contractual obligations for the month of April 2020.

137.    Defendant, Jeffrey Hawtof paid no attention to the contract or Defendants breach thereof, and ordered Dr. Scheer to return to the hospital without reasonable accommodations.

138.    Thursday, April 16, 2020, Dr. Scheer returned to work and was on-call responding to calls both from and about patients.

139.    Friday, April 17, 2020, Dr. Scheer attempted to continue to work, as per the orders of Defendant, Dr. Jeffrey Hawtof.

140.    April 17, 2020, Dr. Scheer was forced to work without reasonable accommodations at Beebe hospital.

141.    Dr. Scheer met with Defendant, Jeffrey Hawtof on April 17, 2020, to discuss with Dr. Hawtof the abrupt discontinuation of Dr. Scheer's reasonable accommodations.

142.    Dr. Scheer reminded Defendant, Hawtof that Dr. Scheer was working using telemedicine as a reasonable accommodation due to a disability under the ADA.

143.    Dr. Scheer also informed Defendant, Hawtof that Dr. Scheer may require medical leave under the Family and Medical Leave Act ("FMLA") as Dr. Scheer could not perform the necessary function of his employment without the reasonable accommodations, i.e., telemedicine.

144.    Dr. Scheer was directed to employee services, who immediately approved Dr. Scheer's already approved reasonable accommodation request in the form of telemedicine.

16

145.    Dr. Scheer began utilizing telemedicine to perform the necessary functions of his employment on April 17, 2020.

146.    April 17, 18, and 19, 2020, Dr. Scheer continued utilizing telemedicine to perform the necessary functions of his employment by treating patients for neurology and stroke services from his home.   Once again, the telemedicine program worked and was a complete success.

147.    Dr. Scheer agreed with Defendants that he would not require leave under the FMLA if Defendants would continue to provide Dr. Scheer with the reasonable accommodations in the form of telemedicine.

148.    April 20, 2020, Dr. Scheer was contacted by employee services from Beebe Hospital.   Dr. Scheer was instructed to complete an online application for reasonable accommodations and leave under the FMLA.

149.    Dr. Scheer asked why he was being instructed to request leave under the FMLA when it was already agreed that he would not require medical leave due to the reasonable accommodations.

150.    Defendants would not provide further information.

151.    April 20, 2020, Dr. Scheer received a telephone call from Defendant, Dr. Gulab and Defendant, Katie Halen, who is also a Defendant named in this case and who also subjected Dr. Scheer to discrimination and harassment in the workplace.

152.    Defendant, Katie Halen was the then Director of Human Resources for Beebe Healthcare and Beebe Medical Group.

153.    During the April 20, 2020, phone call from Defendant, Gulab and Defendant, Halen, Dr. Scheer was notified that Defendants were again rescinding the reasonable accommodations.

154.    There was no discussion for how Dr. Scheer could continue to perform the necessary function of his employment.  There was no discussion about the telemedicine.  Dr. Scheer was simply notified that Defendants made the decision to discontinue the accommodations.

155.    Defendant, Gulab and Defendant, Halen threatened Dr. Scheer, stating, "if you don't stop using telemedicine and if you don't come to the hospital tomorrow, you are fired."

156.    Defendant, Gulab and Defendant, Halen did not have the authority or right to terminate Dr. Scheer on April 20, 2020, as Dr. Scheer had already worked more days than the minimum 14 required by the contract each month.

157.    Dr. Scheer notified Defendant, Gulab and Defendant, Halen that Dr. Scheer had already worked more than 14 days as required by the contract in April 2020.

158.    Defendant, Gulab and Defendant, Halen replied, "stop playing games and get in here or it's not going to go well for you."

159.    Dr. Scheer was subjected to threats, intimidation, condensation, and other forms of harassment even though Dr. Scheer was working the number of days required under the contract.

160.    Defendant, Gulab and Defendant, Halen informed Dr. Scheer that they were unilaterally eliminating all reasonable accommodations without any interactive process or consideration.

161.    Defendant, Gulab and Defendant, Halen threatened Dr. Scheer.

162.    Defendant, Gulab and Defendant, Halen ordered Dr. Scheer to return to work the following day or be terminated.

163.    Dr. Scheer informed Defendant, Gulab and Defendant, Halen that he was suffering from a disability under the ADA.

164.    Defendant, Gulab and Defendant, Halen replied by telling Dr. Scheer to "stop playing games."

18

165.    Defendant, Gulab and Defendant, Halen also informed Dr. Scheer that any more requests for reasonable accommodations or attempts to use his rights under the ADA will "not be good for you."

166.    Dr. Scheer was threatened with retaliation if Dr. Scheer attempted to utilized rights under federal and state laws.

167.    April 21, 2020, Dr. Scheer received an email from Defendant, Halen making good on Defendant, Gulab and Defendant, Halen's threats.

168.    Defendants unlawfully eliminated Dr. Scheer's reasonable accommodations.

169.    At no time did the reasonable accommodations pose an undue burden upon Defendants.

170.    At no time did Defendants engage Dr. Scheer in an interactive process to discuss the elimination of Dr. Scheer's reasonable accommodations.

171.    Dr. Scheer utilized telemedicine April 17, 18, 19, and 20, 2020.   Dr. Scheer was not permitted to utilize telemedicine April 21, 2020, due to the threats and unlawful conduct of Defendant, Gulab and Defendant, Halen.

172.    April 21, 2020, Dr. Scheer worked in Beebe hospital because of the threats to which Dr. Scheer was subjected by Defendant, Gulab and Defendant, Halen.

173.    This caused Dr. Scheer to suffer an exacerbation to his medical condition which was the basis for Dr. Scheer's requests for reasonable accommodations.

174.    Dr Scheer worked with a cane all day April 21, 2020, and had a difficult time moving around, walking, or performing the necessary functions of his employment without the reasonable accommodations that Defendant, Gulab and Defendant, Halen eliminated unilaterally.

175.    Dr. Scheer completed an FMLA certification at the end of April 2020 for intermittent medical leave.

19

176.   Dr. Scheer did not require FMLA as long as Defendants provided Dr. Scheer with reasonable accommodations under the state and federal laws in the form of telemedicine.

177.   When Dr. Scheer returned to work April 21, 2020., Dr. Scheer discovered that Defendants were still utilizing telemedicine for stroke and neurology services through Jefferson Hospital.

178.   Therefore, there is no argument that the reasonable accommodations caused Defendants an undue hardship or burden because Defendants were allowing telemedicine to continue, just not for Dr. Scheer.

179.   Defendants did not eliminate the telemedicine program.  Defendants simply refused to allow Dr. Scheer to participate in the telemedicine program and refused to provide Dr. Scheer with reasonable accommodations due to Dr. Scheer's disability under the ADA.

180.   Dr. Scheer completed documentation including an FMLA certification at the end of April 2020.

181.   At all times, Dr. Scheer requested intermittent leave under the FMLA, however, Defendants refused to allow Dr. Scheer to utilize intermittent FMLA leave.

182.   Defendants unilaterally treated Dr. Scheer's FMLA request as extended leave and required Dr. Scheer to provide medical documentation clearing Dr. Scheer to return to work, even though, Dr. Scheer never took extended leave.

183.   Dr. Scheer suffered from an acute exacerbation of his psoriatic arthritis sometime around May 5, 2020, due to Defendants refusal to and elimination of the reasonable accommodations to which Dr. Scheer was temporarily provided.

184.   Dr. Scheer was required to call out sick, using sick time for the first time in nearly a decade.

185.    Defendants immediately subjected Dr. Scheer to discrimination and harassment in the workplace by threatening to take away Dr. Scheer's hospital privileges and directorship.

186.    Defendants threats to take away Dr. Scheer's hospital privileges and directorship was due to Dr. Scheer using sick time approximately once in nearly a decade.

187.    Defendants also subjected Dr. Scheer to discrimination and harassment in the workplace by calling Dr. Scheer derogatory names aimed toward his age and disability.

188.    Defendants told Dr. Scheer that he was about to "drop dead" and that they needed to be ready to "replace" Dr. Scheer due to Dr. Scheer's medical status and age.

189.    Defendants subjected other older employees and employees who presented with medical issues to discrimination and harassment in the workplace.

190.    Defendant Mary Francis Suter informed Dr. Scheer that "we are looking to retire you."

191.    Defendant, Mary Francis Suter informed Dr. Scheer that she could not believe that certain older doctors in their seventies still had the wherewithal to continue working.

192.    Defendant, Mary Francis Suter made age-based and discriminatory comments directed to Dr. Scheer and other older employees including Dr. Katz.

193.    Defendants continued their refusal to provide Dr. Scheer with reasonable accommodations in June, July, and August 2020.

194.    Defendants' refusal to provide reasonable accommodations included the refusal to provide telemedicine.

195.    When Dr. Scheer was forced to continue visiting the hospital in person in order to avoid being unlawfully terminated from his employment, Dr. Scheer requested other reasonable accommodations in the form of protective gear.

196.    This occurred during the COVID 19 pandemic when the hospital was treating patients infected with the COVID 19 virus and Dr. Scheer was subjected to significant risk of mortality if he contracted the disease.

197.    Defendants continued to refuse to provide Dr. Scheer with protective gear throughout the COVID 19 pandemic.

198.    Dr. Scheer reported Defendants severe and pervasive discrimination and harassment in the workplace, repeatedly in writing.

199.    Defendants replied to Dr. Scheer's reports of discrimination and harassment in the workplace by informing Dr. Scheer that Dr. Scheer would not receive any special treatment and would not receive reasonable accommodations including protective gear or telemedicine.

200.    Defendants breached Dr. Scheer's contract repeatedly in a coordinated effort to subject Dr. Scheer to severe and pervasive discrimination and harassment in the workplace.

201.    Defendants refused to even consider or acknowledge Dr. Scheer's repeated reports of discrimination and harassment in the workplace.

202.    Defendants refused to investigate Dr. Scheer's many reports of discrimination and harassment in the workplace.

203.    Defendants did not interview a single person, or even ask Dr. Scheer to elaborate, and/or explain the reason for the reports of discrimination and harassment in the workplace.

204.    In lieu of responding with a prompt and meaningful investigation, Defendants employed a strategy of ignorance, and ignored every one of Dr. Scheer's requests for help and reports of unlawful conduct in the hospital.

205.    Defendants subjected Dr. Scheer to a hostile work environment as the discrimination and harassment was severe and pervasive and regular and continuous and aimed toward interfering with Dr. Scheer's work environment.

206.    Defendants have taken steps toward interfering with Dr. Scheer's ability to gain reemployment.

207.    Defendants still, today, utilize the same telemedicine services that Dr. Scheer requested as a reasonable accommodation and that were denied to Dr. Scheer without any consideration for undue burden or an interactive process.

208.    From May 2020 through Dr. Scheer's unlawful termination from employment in September 2020, all of Dr. Scheer's responsibilities and privileges were systemically eliminated in a coordinated effort to see that Dr. Scheer had no work to perform at Beebe Hospital.

209.    Dr. Scheer got sick and requested help from the hospital and the hospital responded with anger and resentment that Dr. Scheer would even think about getting sick and needing assistance from his employer.

210.    From the time that Dr. Scheer began to request assistance due to his disability under the ADA to the unlawful termination, was only five months.

211.    After a decade of superb dedication, Dr. Scheer grew Beebe's neurology department to an award-winning, and nationally recognized Advanced Primary Stroke Center. Then Dr. Scheer got sick, and it took Beebe only five months to end Dr. Scheer's employment.

212.    Defendant began the process of eliminating Dr. Scheer's employment by farming all neurology and stroke services to other hospitals in Delaware and Pennsylvania.  Defendants also informed Dr. Scheer that Dr. Scheer was no longer permitted to treat stroke and neurology patients.

213.    From May 2020 through September 2020, Defendants employed a strategy aimed to eliminate the neurology services that Dr. Scheer could provide, even at the risk of patient health and safety.

214.    Defendants systematically eliminated Dr. Scheer's ability to perform his duties and responsibilities as Director of Neurology and Stroke Services or as Neuro-Hospitalist.

215.    Defendants ignored patient care and safety in the strategy of discriminatory conduct aimed toward eliminating Dr. Scheer's employment.

216.    From June 2020 through September 2020, Dr. Scheer reported discrimination and harassment in the workplace and was denied a right to a reasonable investigation or ameliorative action.

217.    Dr. Scheer received a letter dated August 21, 2020, on September 15, 2020, from Defendant Lynne Boskamp.  The August 21, 2020, correspondence was part of Defendants targeted campaign of discrimination and harassment in the workplace.

218.    Defendant, Boskamp wrote to Dr. Scheer, in the August 21, 2020, correspondence, that she had discussed certain matters with Dr. Scheer previously.  This was not true at all.  At no time did Dr. Scheer ever meet with Defendant, Boskamp.

219.    Defendant, Boskamp's August 21, 2020, correspondence lacks any credibility and is part of Defendant, Boskamp's campaign of discrimination and harassment in the workplace.

220.    The August 21, 2020, letter from Defendant, Boskamp unlawfully terminated Dr. Scheer's Medical Director Agreement with Beebe Healthcare.

221.    Any proffered reason for terminating Dr. Scheer's Medical Director Agreement is pretext, to hide Defendants discrimination and harassment in the workplace.

222.    Defendants unlawfully terminated the employment of Dr. Scheer in September 2020 due to Dr. Scheer's disability and age and in retaliation for Dr. Scheer continued reports of unlawful conduct and comments including but not limited to Defendants discrimination and harassment in the workplace.

223.    Defendants conduct also interfered with Plaintiff's rights under the FMLA and was retaliation for Plaintiff's attempts to utilize federally protected medical leave.

224.    At all times material to this civil action, Plaintiff was both a w2 employee for Defendants and a 1099 employee.

225.    Sometime around September 2020, Plaintiff received a letter from Defendants notifying Plaintiff of his termination from employment.

226.    Plaintiff was terminated because of age.

227.    Plaintiff was terminated due to his disability.

228.    Plaintiff was terminated for reporting unlawful conduct of Defendants.

229.    The stated reason for Plaintiff's termination is mere pretext to coverup the actual reason for Plaintiff's termination.

230.    During Plaintiff's employment for Defendants, Plaintiff was subjected to severe and pervasive discrimination and harassment in the workplace because of Plaintiff's age, disability and in retaliation for reporting unlawful conduct.

231.    Sometime around September 2020, Plaintiff was ordered to immediately stop the practice of neurology at Beebe hospital.

232.    Plaintiff was also notified that he was no longer permitted to visit Beebe Hospital.

233.    Plaintiff was ordered not to visit Beebe hospital even though Plaintiff still was a part of the Beebe hospital network of doctors and still received calls to help treat patients who visited Beebe.

234.    Defendants refusal to allow Plaintiff to visit Beebe was highly irregular and part of the retaliation strategy.

235.    Plaintiff and Dr. Katz were informed that the hospital was looking for "Young blood" in order to revamp the neurology service.

236.    Plaintiff's colleague, Dr. Katz was referred to as "old and lame "and part of the neurology service that can easily be replaced."

237.    The comments to which Dr. Katz was subjected were due to Dr. Katz's age and disability.

238.    Defendants informed Dr. Scheer that he was no longer permitted to visit Beebe Hospital, even though, Dr. Scheer remains in good standing with the hospital and maintains hospital privileges even today.

239.    Defendants strategy of retaliation continues as Defendants have taken steps to make it more difficult for Plaintiff to mitigate his back pay damages.

240.    As a result of Defendants' conduct, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

241.    As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

242.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails.

243.    Plaintiff also suffers future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

244.    Plaintiff has further experienced severe emotional and physical distress.

245.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against all the Defendants, jointly and severally.

246.    Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

247.    Defendants at all times refused to investigate or take appropriate remedial action in response to Plaintiff's complaints of discrimination, harassment and hostile work environment.

248.    Defendants discriminatory conduct was severe and pervasive, creating a hostile work environment for Plaintiff.

249.    The above are just some examples, of some of the discrimination and retaliation to which Defendants subjected Plaintiff.

250.    Plaintiff claims a practice of discrimination and claims continuing violations and makes all claims herein under the continuing violations doctrine.

251.    Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

252.    Plaintiff, Dr. Scheer, claims unlawful termination and requests reinstatement.

**COUNT I**
**DISCRIMINATION UNDER**
**AMERICANS WITH DISABILITIES ACT**
**(against Corporate Defendants Only)**

253.    Plaintiff, Dr. Scheer, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

254.    Title 42 of the Americans with Disabilities Act of 1990 (Pub. L. 101-336), Chapter 126, Subchapter I, § 12112, Discrimination [Section 102] states: "(a) General rule. – No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

255.    Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of his disabilities.

256.    From the time his medical condition began to the day of his termination; Plaintiff was capable of performing the duties and job requirements of his position.

257.    Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

258.    From the time his medical condition presented to the day of her termination; Plaintiff attempted to engage Defendants in an interactive process to discuss reasonable accommodations.

259.    Defendant terminated Plaintiff because of his disability.

260.    Such adverse employment action by Defendant were in violation of the ADA.

261.    Following Defendant's termination of Plaintiff, Plaintiff was replaced by a non-disabled individual.

262.    As a result of Defendant's actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

263.    Plaintiff also claims unlawful retaliation under the ADA for his opposition to Defendant's unlawful employment practice.

264.    Plaintiff makes claims for all damages available under the ADA.

265.    Defendants also created a hostile work environment for Plaintiff by subjecting Plaintiff to severe and pervasive discrimination and harassment in the workplace and by intentionally interfering with Plaintiff's work environment.

## COUNT II
## RETAILIATION UNDER
## <ins>AMERICANS WITH DISABILITIES ACT</ins>
### (against Corporate Defendants Only)

266.     Plaintiff, Dr. Scheer, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

267.     SEC. 12203. [Section 503] states, "(a) Retaliation. – No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testifies, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

268.     Defendants violated the above and Plaintiff suffered numerous damages as a result.

269.     Defendants retaliated against Plaintiff when Plaintiff opposed Defendants discriminatory animus to which Plaintiff was subjected during his employment.

## COUNT III
## VIOLATION OF THE FMLA
## <ins>INTERFERENCE AND RETALIATION</ins>
### (against all Defendants)

270.     Plaintiff, Dr. Scheer, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

271.     § 2612 of the FMLA states in pertinent part:

(a) In General

(1) Entitlement to leave

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period of one or more of the following:

(A) Because of the birth of son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of the son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee if such spouse, or a son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

272.    Defendants violated Plaintiff's rights under the FMLA by interfering with Plaintiff's leave by failing to advise Plaintiff of his rights as afforded by the FMLA.

273.    Defendants, by and through its managers, officials, and employees, by acts or representations intentionally or through culpable negligence failed to inform Plaintiff of any rights, privileges, and protections offered through the FMLA.

274.    Defendants violated Plaintiff's rights by failing to provide her with appropriate leave there under.

275.    § 2615 of the Act states as follows: Prohibited acts

(a) Interference with rights

(1) Exercise of rights:

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the subchapter.

(2) Discrimination:

30

> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing nay practice made unlawful by this subchapter.

276. Defendants interfered with Plaintiff's rights under the above section and discriminated against Plaintiff by refusing to allow Plaintiff to utilize the leave provided by the Act and instead discharged Plaintiff from employment.

277. Defendants did not satisfy the notice requirements of the FMLA. Accordingly, Defendants interfered with Plaintiff's rights under the FMLA by failing to notify Plaintiff of his rights under the FMLA; including the right to be make use of the afforded leave.

**COUNT IV**
**DISCRIMINATION UNDER THE AGE**
**DISCRIMINATION IN EMPLOYMENT ACT**
**(against Corporate Defendants Only)**

278. Plaintiff, Dr. Scheer, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

279. Section 626 of the ADEA provided it shall be unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against an individual with respect to their compensation, terms, conditions or privileges of employment, because of such individual's age;

> (2) to limit, segregate, or classify their employees in any way which would deprive or tent to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

> (3) to reduce the wage rate of any employee in order to comply with this chapter.

> (4) It Shall be unlawful for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to

classify or refer for employment any individual on the basis
of such individual's age.

280.    Defendants engaged in unlawful employment practices prohibited by Section 626 of the ADEA by discriminating against Plaintiff because of his age.

281.    Defendants' age-based comments and conduct were severe and pervasive and occurred on a daily and/or weekly basis so that Plaintiff could not escape the discrimination and harassment in the workplace.

282.    Accordingly, Plaintiff was subjected to a hostile work environment due to Plaintiff's age.

283.    Defendants' conduct was severe in that Defendants engaged in acts of discrimination and harassment whereby a single act of Defendants' harassment was sufficient to create a hostile work environment.

284.    Defendants' conduct was pervasive in that Defendants continually subjected Plaintiff to abuse, ridicule, insults, criticism, contempt, and scorn, day after day so that Plaintiff was forced to endure age-based discrimination and harassment in the workplace on a daily and/or weekly basis.

285.    Defendants subjected Dr. Scheer to disparate treatment by terminating Plaintiff's employment because of his age and unilaterally eliminating Plaintiff's hospital privileges.

**COUNT V**
**RETALIATION UNDER THE AGE**
**DISCRIMINATION IN EMPLOYMENT ACT**
**(Against Corporate Defendants Only)**

286.    Plaintiff, Dr. Scheer, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

287.    Section 623 (d) of the ADEA states the following:

"It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or application for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."

288.     Defendants violated Section 623 (d) of the ADEA because Defendants discriminated against Plaintiff due to Plaintiff's complaints of Defendants' unlawful employment practices as previously set forth herein.

289.     Plaintiff opposed and/or reported the continual discrimination and harassment in the workplace and Defendants' conduct continued and ratcheted up.

290.     Moreover, Plaintiff was subjected to disciplinary measures such as counseling and termination after Plaintiff opposed and/or reported the discrimination and harassment in the workplace.

## COUNT VI
## DISCRIMIINATION UNDER THE
## DELAWARE DISCRIMINATION IN EMPLOYMENT ACT
### (Against Corporate Defendants Only)

291.     Plaintiff, Dr. Scheer, hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

292.     Section 711 (a)(1) of the DDEA states the following:

"(1) Fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, marital status, genetic information, color, age, religion, sex (including pregnancy), sexual orientation, gender identity, or national origin"

293.   Defendants engaged in unlawful employment practices prohibited by 711 (a)(1) of the ADEA by discriminating against Plaintiff because of his age.

294.   Defendants' age-based comments and conduct were severe and pervasive and occurred on a daily and/or weekly basis so that Plaintiff could not escape the discrimination and harassment in the workplace.

295.   Accordingly, Plaintiff was subjected to a hostile work environment due to Plaintiff's age.

296.   Defendants' conduct was severe in that Defendants engaged in acts of discrimination and harassment whereby a single act of Defendants' harassment was sufficient to create a hostile work environment.

297.   Defendants' conduct was pervasive in that Defendants continually subjected Plaintiff to abuse, ridicule, insults, criticism, contempt, and scorn, day after day so that Plaintiff was forced to endure age-based discrimination and harassment in the workplace on a daily and/or weekly basis.

**SEVENTH CAUSE OF ACTION**
**RETALIATION UNDER STATE LAW**

298.   Plaintiff, Abraham Scheer hereby incorporates all allegations contained in paragraphs one (1) through one-hundred-seventy-seven (297) as fully as if they were set forth at length.

299.   Plaintiff claims violations of the State of Delaware's Laws against discrimination and harassment in the workplace as Plaintiff reported and opposed Defendants discrimination and harassment in the workplace and was subjected to retaliation by Defendants.

## JURY DEMAND

Plaintiff requests a jury trial on all issued to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, liquidated damages, statutory damaged, attorney's fees, costs, and disbursement of action; and for such other relief as the Court deems just and proper.

**THE POLIQUIN FIRM, LLC**

/s/ Ronald G. Poliquin
RONALD G. POLIQUIN, ESQUIRE
Delaware Bar ID No. 4447
1475 S. Governors Ave.
Dover, DE   19904
(302) 702-5501
Attorney for Plaintiff Dr. Abraham Scheer, M.D.


DATED: November 2, 2021